**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

KATHERINE BURNS,                    )
                                    )
      Plaintiff,              )
                                    )
vs.                                 )
                                    )
GAROLD HOLCOMBE,                    )
an individual,                      )
                                    )    **Case No. CIV-11-240-JHP**
CHRISTOPHER EPPERLY,                )
an individual,                      )
                                    )
JENNIFER JOHNSON,                   )
an individual,                      )
                                    )
BOARD OF COUNTY                     )
COMMISSIONERS OF THE                )
COUNTY OF SEMINOLE,                 )
                                    )
      Defendants.             )

## OPINION AND ORDER

Before the Court are Defendant Board of County Commissioners of Seminole County's (the "Board") Motion for Summary Judgment [Doc. No. 45]; Plaintiff's Motion for Summary Judgment [Doc. No. 55]; and Defendants Epperly, Holcombe, and Johnson's Motion for Summary Judgment [Doc. No. 64]. After review of the briefs, and for the reasons stated below, the Board's Motion for Summary Judgment is **GRANTED in part and DENIED in part;** Plaintiff's Motion for Summary Judgment is **DENIED;** and Defendants Epperly, Holcombe, and Johnson's Motion for Summary Judgment is **GRANTED in part and DENIED in part.**

## BACKGROUND

### I. Procedural History

On July 12, 2011, Plaintiff commenced this action by filing a Complaint in this Court, alleging various torts and civil rights violations culminating in her arrest on March 5, 2008. [Doc. No. 2]. Plaintiff subsequently amended her Complaint on February 16, 2012. [Doc. No. 36]. In her First Amended Complaint, Plaintiff asserted the following claims against Defendants Epperly and Holcombe: (1) § 1983 claim for unlawful arrest in violation of the Fourth Amendment to the Constitution; (2) § 1983 claim for unlawful seizure in violation of the Fourth Amendment to the Constitution; (3) § 1983 claim for conspiracy; (4) state law malicious prosecution claim[1]; and (5) state law abuse of process claim.[2] [*Id*]. As to Defendant Johnson, Plaintiff asserted the following claims: (1) § 1983 claim for conspiracy; (2) state law malicious prosecution claim; and (3) state law abuse of process claim. Plaintiff also asserted the following state law tort claims against the Board: (1) assault, (2) battery, (3) false arrest, (4) malicious prosecution, and (5) abuse of process.

On May 2, 2012, the Board filed a Motion for Summary Judgment, seeking dismissal of all of the claims against it. [Doc. No. 45]. On May 18, 2012, Plaintiff filed a Motion for Summary Judgment, seeking judgment on the claims asserted against the Board. [Doc. No. 55]. Then, on June 1, 2012, Defendants Epperly, Holcombe, and Johnson filed their Motion for Summary Judgment as to all claims pending against them. [Doc. No. 64]. On March 4, 2013,

---

[1] In her briefing and during oral arguments on the pending motions, Plaintiff did not object to Defendants' numerous characterizations of her malicious prosecution claim as a claim brought pursuant to Oklahoma law; therefore, the Court evaluates Plaintiff's claim as such below. However, the Court notes that even if Plaintiff intended to bring a malicious prosecution claim pursuant to § 1983, Defendants Epperly, Holcombe, and Johnson would be entitled to qualified immunity on any § 1983 malicious prosecution claim brought by Plaintiff.

[2] Plaintiff conceded that the abuse of process claims against Defendants Epperly, Holcombe, and Johnson should be dismissed. [Doc. No. 75, 15]. Accordingly, Defendants Epperly, Holcombe, and Johnson are entitled to summary judgment on Plaintiff's abuse of process claim.

the Court heard oral arguments from the parties on their respective motions for summary judgment. [Doc. No. 91]. On April 4, 2013, after further consideration of the parties oral arguments and briefs, the Court requested further briefing from the parties on two issues: (1) qualified immunity as to each of the relevant claims against each defendant; and (2) the legality of each of the seizures of property alleged by Plaintiff, specifically addressing the legal justification for each seizure and the reasonableness of the techniques used in executing the seizures. [Doc. No. 92]. The parties subsequently filed supplemental briefs on May 28, 2013.

## II. Factual Background

Starting in late 2007, Plaintiff and Defendant Johnson began exchanging a large volume of hang-up telephone calls. Specifically, Plaintiff began making numerous hang-up telephone calls from her cellular telephone to the administrative telephone number of Seminole County 911 Dispatch Center ("911 Administrative Line"), where Defendant Johnson is employed as a dispatcher, as well as Defendant Johnson's personal cellular telephone number. In response, Defendant Johnson placed numerous hang-up calls to Plaintiff's cellular telephone number from the 911 Administrative Line and her personal cellular telephone. Defendant Johnson asserts that these calls, both from her personal cellular telephone and the 911 Administrative Line, were made pursuant to a policy requiring dispatcher's to return each hang-up call three times.[3]

Plaintiff contends the dispute began when she first received a threatening telephone call from Defendant Johnson warning Plaintiff to stay away from her "boyfriend." Plaintiff further contends the person Defendant Johnson was talking about was Johnson's husband, Brad Johnson, who had been flirting with Plaintiff at the McDonalds where Plaintiff was employed. This contention is supported by statements Brad Johnson made to Vera Conrad and Jennifer

---

[3] The Court notes that testimony from the underlying criminal trial suggests the return telephone calls made by Defendant Johnson were not consistent with this policy.

Jewel Johnston (a friend of Defendant Johnson). Specifically, Jennifer Jewel Johnston testified that Brad Johnson informed her that he had an affair with a girl at McDonalds, and that Defendant Johnson "got ahold of [his] phone and saw the texts and put a stop to it." [Doc. No. 54, Ex. 4 at 13]. Further, Brad Johnson also told Vera Conrad that he had an affair with a girl at McDonalds, but his wife, Defendant Johnson, discovered the affair and started "harassing the young girl." [Doc. No. 54, Ex. 5 at 17-19].

On November 12, 2007, Defendant Johnson filed a police report (the "November 12 Police Report"), indicating that she was receiving harassing telephone calls to the 911 Administrative Line from Plaintiff's cellular telephone number. In the days leading up to Defendant Johnson's filing of the November 12 Police Report, both Plaintiff and Defendant Johnson were placing hang-up telephone calls, with Defendant Johnson placing fifteen calls to Plaintiff's cellular telephone number from both her personal telephone number and the 911 Administrative Line.[4] Significantly, Defendant Johnson placed the first two of these calls from the 911 Administrative Line to Plaintiff's cellular telephone, a fact not reflected in any of Seminole County records regarding the report or subsequent investigation.[5]

---

[4] At the underlying criminal trial, Defendant Johnson testified to the following:

> Q. Now, if you look at this—and you can count them if you'd like—would you agree with me that you, either through the call center phone or your personal cell phone or your text messages, you made 15 calls to [Plaintiff's cellular phone number], and that number responded back to you 18 times, is that correct?
>
> A. Uh-huh—Yes.
>
> Q. And you filed a police report that day, did you not?
>
> A. Yes.

[Doc. No. 54, Ex. 1 at 34].

[5] It is unclear whether Defendant Johnson simply failed to inform Defendants Epperly and Holcombe that she was also placing a high volume of telephone calls to Plaintiff. [*See* Doc. No. 54, Ex. 1 at 34-35].

After Defendant Epperly received the November 12 Police Report from Defendant Johnson, Defendant Epperly, along with Defendant Holcombe and two other officers, went to Plaintiff's home to investigate the alleged hang-up telephone calls. Defendant Epperly provided the following narrative describing his actions in response to the November 12 Police Report:

> [O]n 11-12-2007 I…was called to go to [Plaintiff's home] in reagurds [*sic.*] to our dispatch center receiving calls from a cell phone at that location. [W]hen I arrived I spoke with [Plaintiff] and she admitted she had made the calls. I had her fill out a voluntary statement stateing [*sic.*] what she had done. [S]he was not very open about the incident. … I spoke with her mother and she stated that [Plaintiff] had done this in the past…. [A]t this time I advised the mother that I was going to seize the cell phone because [Plaintiff] had used it to make prank phone calls. [O]n 11-13-2007 at 0920 I spoke with [Plaintiff's] father [D]ickie [B]urns and he said he was going to the cell co[mpany] to get a copy of the phone records and that he may provide us with a copy. [H]e would not sign the consent to search form so we could look at the calls dialed on the phone.

[Doc. No. 54, Ex. 8 at 3].[6] Although Plaintiff's mother was at home when the Defendant Epperly questioned Plaintiff, Plaintiff and her mother were separated at the time Defendant Epperly questioned Plaintiff on November 12, 2007. It is unclear whether Defendant Epperly obtained permission from Plaintiff's mother to question Plaintiff. Nevertheless, Defendant Epperly received a voluntary statement from Plaintiff, in which Plaintiff admitted to calling "different police stations" and "police officer[']s phone numbers."[7] [Doc. No. 54, Ex. 8 at 5]. After Plaintiff signed the voluntary statement, the following statement was added to Plaintiff's statement: "Has called on 911 4 yrs ago as a prank, teachers and SP's on Bases." [Doc. No. 75,

---

[6] On May 11, 2010, Defendant Epperly executed a sworn affidavit claiming, among other things, that after arriving at Plaintiff's residence he "phoned the dispatch center and asked that they call the number making the 911 calls." [Doc. No. 64, Ex. 24 at ¶ 4]. Defendant's May 11, 2010 statement further alleges that Plaintiff's cellular telephone began to ring in response to his request. [*Id.*] The Court notes, however, that this information was not included in his report, and, even as Plaintiff claims the call never occurred, Defendants have not produced any records to corroborate Defendant Epperly's statement.

[7] Burns contends the officers came to her home and questioned her without her parents' approval or supervision (she was seventeen at the time) and then "required her" to fill out a voluntary statement and seized her telephone. [Doc. No 75, 10].

Ex. 9 at 14-16]. There is a dispute as to who added this additional information to Plaintiff's

November 12, 2008 voluntary statement.

On November 27, 2007, Defendant Johnson filed another police report with the Seminole

County Sheriff's Department (the "November 27 Police Report"). Defendant Johnson's police

report provided the following:

> On Tuesday, November 27, 2007, at approximately 8:15 a.m. I received a text
> message from 405-380-6094 and because I did not recognize the number I text
> back and asked who this was. I received another text saying that they text me by
> mistake and not to worry so I text back that I wanted to know who it was and how
> they got my number. Received another text with the same message. I then called
> the number that the text was coming from and got the same voicemail that we had
> come in contact with on November 12, 2007 that was calling and harassing the
> police station. I then hung up and text back that I knew who it was and that I
> wanted my number deleted from their phone. I then received another text that
> said "I don't think u know but ok."

[Doc. No. 54, Ex. 10 at 5]. This incident did not involve any calls to the 911 Administrative

Line.

Defendant Holcombe received the November 27 Police Report from Defendant Johnson,

and asked Phong Nguyen, a Seminole Nation Lighthorse Police Department officer, to assist in

the investigation. Defendant Holcombe provided the following narrative describing his actions

in response to the November 27 Police Report:

> I received a notice from central dispatch that Ms[.] Burns had been text messaging
> Ms[.] Johnson with harassing messages to her personal cell phone. Lighthorse
> 1208 Nguyen went to the residence of Burns and was advised that Burns was at
> work at McDonald[']s in Seminole. 1208 made contact with Ms[.] Burns after
> receiving permission from the mother. Ms[.] Burns provided a written statement
> admitting to making the calls and text messages. 1208 took the cell phone as
> evidence and contacted me to pick up the statement and phone. Phone was
> logged into evidence. This is the second time in 15 days that we have taken
> harassment calls on Burns.

[Doc. No. 54, Ex. 10 at 4]. It is unclear whether Officer Nguyen actually received permission

from either of Plaintiff's parents to question her on November 27, 2007. Officer Nguyen

obtained a voluntary statement from Plaintiff, wherein Plaintiff stated, "I have texted and called officers and police stations several times [and] was calling and texting … [S]eminole [D]ispatch." [Doc. No. 64, Ex. 17 at 2].

On March 5, 2008, Defendant Johnson filed a third police report with the Seminole County Sheriff's Department (the "March 5 Police Report") after Plaintiff and Defendant Johnson had another exchange of text messages and hang-up calls on March 4 and 5, 2008. During one of these exchanges on March 4, 2008, Defendant Johnson told the caller that she "was going to get the Deputy to come and get her phone again … ." [Doc. No. 54, Ex. 13]. At some point on the morning of March 5, 2008, Defendant Johnson contacted Defendant Holcombe about the recent telephone communications between Plaintiff and Defendant Johnson. While Defendant Holcombe was in route to get a statement from Defendant Johnson, Defendant Johnson and Defendant Epperly had the following telephone conversation regarding Defendants Epperly and Holcombe's plans to arrest Plaintiff:

Epperly: Hey it's county 9, what's going on?

Johnson: Have you talked to Garold?

Epperly: Yeah, I talked to him while I'm down here I'm going to finished writing this guy a couple of tickets and I'm going to arrest her.

Johnson: Oh my god, are you really?

Epperly: Yeah.

Johnson: Oh, I love you so much.

Epperly: Garold is on his way up there to meet with y'all to get y'all's report.

Johnson: Okay, well, she's still calling and Tommy is on his way to the cellular company to have her phone shut off 'cause she called 911 all day yesterday too.

Epperly: Okay, well make sure you have all of that in your report.

Johnson: Alrighty.

Epperly: I'll go ahead and hook her up and take her that way.

Johnson: Well she should be there at McDonald's when you get there, that's where she works.

Epperly: Yeah, that's where I'm headed. I'll give y'all a holler back later.

Johnson: Okay, I can't wait.

Epperly: Alright, bye bye.

[Doc. No. 54, Ex. 12].

Following this conversation, Defendant Holcombe arrived at the station to get a statement from Defendant Johnson. Defendants Holcombe and Johnson attest that while Defendant Holcombe was taking Defendant Johnson's statement at the dispatch center, Marie Grant ("Grant") "called [his] attention to a phone call coming into the 911 call center." [Doc. No. 45, Ex. 2]. Defendant Holcombe stated that Grant identified the incoming call as a 911 call. [*Id.*] Defendants Holcombe and Johnson further contend the call center computers prompted information showing Plaintiff's telephone number, approximate location, and other general information. Grant stated the following:

> While Ms. Johnson and Deputy Holcombe were talking, another phone call came in from (405) 380-6094. I called Ms. Johnson and Deputy Holcombe to my station to see the 911 call coming in from 380-6094. Based upon the way the information was displayed on my monitor, I concluded that this was a 911 call and not a call on the administrative line. There is no way that a call on the administration line would have displayed the way this call displayed…. Based upon my training and experience, I informed Deputy Garold Holcombe that this was a 911 call. I showed Deputy Holcombe the difference between a call on the administration line and a 911 call by showing him the triangulation provided by the cell towers near the caller.

[Doc. No. 45, Ex. 8].[8] Defendant Holcombe also contends he saw a text message on Defendant Johnson's telephone from Plaintiff which said "I know more about you than you think." Following Plaintiff's arrest, Defendant Holcombe also provided a description of the facts surrounding Plaintiff's arrest in a "Probable Cause Affidavit for Arrest Without Warrant." [Doc.

---

[8] The Court does not consider the prior statement of Ms. Grant, wherein she does not make any mention of the 911 telephone call allegedly made on the morning of March 5, 2008.

No. 45, Ex. 3]. In this affidavit, Defendant Holcombe did not make any mention of witnessing a prank 911 telephone call on the morning of March 5, 2008. [*See id.*] However, in an affidavit executed in 2010, Defendant Holcombe now asserts he witnessed a prank 911 telephone call from Plaintiff's cellular telephone number on the morning of March 5, 2008. Nevertheless, Defendants now concede, and the evidence confirms, that there were no calls placed from Plaintiff cellular telephone to the dispatch center on the morning of March 5, 2008. [Doc. No. 54, Ex. 1 at 71, 105].

Further, at Plaintiff's criminal trial, Tommy Arnold confirmed that no call was received on the 911 line from Plaintiff's cellular telephone on March 5, 2008. Instead, Arnold testified that Grant actual "did a manual lookup on [(405) 380-6094] to try to find out more information about the number." [Doc. No. 54, Ex. 1 at 105]. Arnold also testified that there were distinct differences between an incoming 911 call and an incoming call to the 911 Administrative Line. Specifically, that 911 calls are automatically displayed on the dispatcher's screen, whereas calls to the 911 Administrative Line require the operator to take additional steps before the call is displayed on the dispatcher's screen. Defendant Johnson also acknowledged these differences.[9]

After Defendant Holcombe contacted Defendant Epperly to assist him with Plaintiff's arrest, they travelled to Plaintiff's place of employment and executed the arrest. The Seminole County Sheriff's Department's computerized dispatch log from the morning of March 5, 2008, indicates that Plaintiff's arrest was completed at "10:09:13 a.m." [Doc. No. 16]. Following Plaintiff's arrest, Defendant Holcombe provided the following in a probable cause affidavit:

---

[9] At the underlying criminal trial, Defendant Johnson testified regarding the way in which 911 emergency call and a call to the 911 Administrative Line differ in terms of what information is displayed on the dispatcher's console. [Doc. No. 51, Ex. 1 at 17]. Defendants Epperly, Holcombe, and Johnson now contend, that "the dispatcher receiving the call would have no way of knowing if an incoming caller had dialed 9-1-1 or one of the ten-digit telephone numbers designated to receive 9-1-1 calls." [Doc. No. 98, 1-2].

Facts and Circumstances that support probable cause to arrest the above named person are [Defendant Johnson] had been receiving text messages on her personal cell phone that included Johnson['s] social security number and home address with comments like do you know what this number is. The phone number on the text messages was the same number that had made ten false 911 calls to dispatch on 4 March 2008. Knowing the number as Ms[.] Burns from previous false 911 calls (case 07-0847)[,] [m]yself and Deputy Epperly went to McDonald['s] in Seminole where we knew she worked. A call to her cell phone number of 405-380-6094 made her cell phone ring and she was taken into custody for the cited offenses. When she was asked why she had been making the calls she refused to answer. When asked if she was wanting to get in trouble she responded, I don't care. Copies of the 911 print outs of the false calls were obtained from 911 center as well as statement from Ms[.] Johnson.

[Doc. No. 45, Ex. 3 at 2]. Defendant Holcombe's contention that a telephone call was placed by Defendant Holcombe to Plaintiff's cellular telephone number prior to her arrest is supported by Defendant Epperly's testimony.[10] However, Plaintiff's telephone inexplicably indicates that the only communication between Defendant Holcombe and Plaintiff's cellular telephone occurred at 10:14 a.m., approximately five minutes after she was arrested.

Plaintiff was charged with harassment by use of electronic device in violation of Okla. Stat. tit. 21, § 1172(A). On April 9, 2009, after a trial in the District Court of Seminole County, Oklahoma (the "underlying criminal trial"), Plaintiff was convicted of harassment by use of an electronic device in violation of Okla. Stat. tit. 21, § 1172(A). Following her conviction, Plaintiff commenced an appeal of her criminal conviction on June 30, 2009, in the Oklahoma Court of Criminal Appeals, Case No. M-2010-341. On November 18, 2011, the Oklahoma Court of Criminal Appeals reversed Plaintiff's criminal conviction, finding that the evidence presented at trial was insufficient to satisfy one of the elements for harassment by use of an electronic device in violation of Okla. Stat. tit. 21, § 1172(A).

---

[10] The Court notes that at the underlying state court criminal trial, Defendant Epperly originally testified that he was not sure whether the telephone call that was allegedly placed to Plaintiff's cellular telephone number on the morning of March 5, 2008, was made before or after Plaintiff was arrested. [Doc. No. 54, Ex. 1 at 89-94]. However, during a subsequent break, he was "reminded" by Defendant Holcombe that the telephone call was placed prior to Plaintiff's arrest. [Doc. No. 54, Ex. 1 at 95-96].

# DISCUSSION

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In making the summary judgment determination, the Court examines the factual record and draws reasonable inferences therefrom in the light most favorable to the non-moving party. *Simms v. Oklahoma*, 165 F.3d 1321, 1326 (10th Cir. 1999). The presence of a genuine issue of material fact defeats the motion. An issue is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249.

Credibility issues fall outside the scope of summary judgment. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000) (citing *Anderson,* 477 U.S. at 255); *see also, Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 432 (1st Cir. 2000) ("court should not engage in credibility assessments."). "There is no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, and no room for the judge to superimpose his own ideas of probability and likelihood. In fact, only if the record, viewed in this manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." *Cruz-Baez v. Negron-Irizarry,* 360 F.Supp.2d 326, 332 (D.P.R. 2005) (internal citations, brackets and quotation marks omitted).

**I.      Claims as to Defendants Epperly, Holcombe, and Johnson**

**A.  § 1983 Claims**

Plaintiff brings claims pursuant to 42 U.S.C. § 1983, which provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

Thus, in order to establish liability under § 1983, the Plaintiff must prove that: (1) a person; (2) subjected or caused one to be subjected to the deprivation of a federal statutory or constitutional right; (3) by someone acting "under the color of law."  42 U.S.C. § 1983.

**1.  Unlawful Seizures in Violation of the Fourth Amendment**

The Fourth Amendment to the Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  Plaintiff asserts that Defendants Epperly and Holcombe (1) violated her Fourth Amendment rights by (a) unlawfully arresting her on March 5, 2008, and (b) seizing her cellular telephone without proper legal justification on three separate occasions; and (2) conspiring to violate her Fourth Amendment rights.   The Court analyzes each of the Fourth Amendment violations asserted by Plaintiff in order to determine whether any are appropriate for summary adjudication.

**a.  Unlawful Arrest**

An arrest qualifies as a "seizure" of a person under the Fourth Amendment and must be reasonable under the circumstances.  *See United States v. Reeves*, 524 F.3d 1161, 1166 (10th Cir. 2008).  "[A] warrantless arrest is constitutionally valid when an officer has probable cause to believe that the arrestee committed a crime."  *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th

Cir. 2010) (citing *Oliver,* 209 F.3d at 1186). Thus, the dispositive issue in this case is whether Defendants Epperly and Holcombe had probable cause to believe Plaintiff had committed a crime at the time of Plaintiff's arrest.

In support of their motion for summary judgment on Plaintiff's unlawful arrest claim, Defendants Epperly and Holcombe argue that (i) Plaintiff is barred by the doctrine of collateral estoppel from litigating the issue of probable cause; and (ii) even if Plaintiff is not barred from litigating the issue of probable cause, Defendants Epperly and Holcombe had probable cause to arrest Plaintiff at the time of her arrest.

### i. Collateral Estoppel

Defendants Epperly and Holcombe assert that Plaintiff is barred by the doctrine of collateral estoppel from litigating the issue of probable cause in the instant action. According to Defendants, the issue of whether there was probable cause for Plaintiff's arrest was already decided at the preliminary hearing in the underlying state criminal proceeding. Because Plaintiff's § 1983 claim for unlawful arrest depends upon a lack of probable cause, Defendant argues that Plaintiff's claim may not proceed.

Under Oklahoma law, the doctrine of collateral estoppel provides that:

> once a court has decided an issue of fact or law necessary to its judgment, the same parties or their privies may not relitigate the issue in a suit brought upon a different claim ... . It operates to bar from relitigation both correct and erroneous resolutions of jurisdictional challenges but it cannot be made binding on anyone unless the party against whom the earlier decision is interposed had "full and fair opportunity" to litigate the critical issue in the earlier case.

*Fent v. Okla. Natural Gas Co., a Div. of Oneok Inc.,* 898 P.2d 126, 133 (Okla. 1984) (footnotes omitted).

The Oklahoma Supreme Court has also explained that "[a] finding of probable cause is inherent in an order binding over a defendant for trial." *Christopher v. Circle K Convenience*

*Stores, Inc.,* 937 P.2d 77, 79 (Okla. 1997). Therefore, in accordance with the doctrine of collateral estoppel, the court also explained that "an order at preliminary hearing binding over the defendant for criminal trial precludes relitigation of the issue of probable cause in a subsequent civil suit for false arrest following acquittal." *Id.* at 79.

Federal courts "apply Oklahoma state law to determine the preclusive effect, if any, of the [state] proceedings on [a] federal court action." *Gouskos v. Griffith*, 122 F. App'x 965, 971 (10th Cir. 2005) (citing *Pittsburg County Rural Water Dist. No. 7 v. City of McAlester,* 358 F.3d 694, 708 (10th Cir. 2005)). In *Gouskos v. Griffith*, the United States Court of Appeals for the Tenth Circuit explained that

> [w]hen a false-arrest defendant desires to use facts from a previous suit prosecuted in a different court system for issue preclusion, Oklahoma law requires the defendant to submit a complete record of the previous case, including *all* the preliminary hearing transcripts, so that the trial court in the false-arrest case can fully review the previous record to determine the "meaning and preclusive force to be accorded [the previous court's] ruling ... by resort solely to the face of the judgment roll ... ." Failure to submit the entire judgment roll "is fatal to [an] issue-preclusion defense" on summary judgment. Summary judgment should have been denied for this reason alone.

*Id.* at 974 (emphasis original). Therefore, Defendant bears the burden of producing the entire judgment roll. The judgment roll, which is synonymous with the record proper, "consists of the petition, the process, the return, the pleadings subsequent thereto, the reports, verdicts, orders, judgments, and all material acts and proceedings of the court." *Robinson v. Texhoma Limestone, Inc.*, 100 P.3d 673, 677 (Okla. 2004). Here, Defendants submitted only part of the record from the state court proceedings. Therefore, Plaintiff is not precluded from relitigating the issue of probable cause.

### ii. *Probable Cause*

"Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a prudent man

in believing that an offense has been or is being committed." *Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985) (citing *U.S. v. Miller,* 532 F.2d 1335, 1337 (10th Cir. 1976)). Probable cause has been described as a "practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." *Brinegar v. U.S.,* 338 U.S. 160, 176 (1949). "To determine the existence of probable cause, courts look at the totality of the circumstances as set forth in the information available to the officers at the time of the arrest." *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010).

In addition, "the legality of an arrest may be established by proving that there was probable cause to believe that the plaintiff had committed a crime other than the one with which [s]he was eventually charged, provided that the crime under which the arrest is made and [the] crime for which probable cause exists are in some fashion related." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1281 (10th Cir. 2008) (quoting *Gassner v. City of Garland, Tex.*, 864 F.2d 394, 398 (5th Cir. 1989) (internal quotation marks omitted)); *see also Devenpeck v. Alford*, 543 U.S. 146, 149 (2004) ("[T]he subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."); *Apodaca v. City of Albuquerque,* 443 F.3d 1286, 1289 (10th Cir. 2006) ("All that matters is whether [the officer] possessed knowledge of evidence that would provide probable cause to arrest her on *some* ground." (emphasis in original)).

"[T]he United States Constitution does not require a warrant for misdemeanors not occurring in the presence of the arresting officer." *Fields v. City of South Houston, Tex.*, 922 F.2d 1183, 1189 (5th Cir. 1991); *see also Franklin v. Thompson,* 981 F.2d 1168, 1170 n. 3 (10th

Cir. 1992); *Knight v. Jacobson,* 300 F.3d 1272, 1276–77 n. 3 (11th Cir. 2002) (noting that every circuit that has addressed the issue has held that the Fourth Amendment does not include an in-the-presence requirement for warrantless misdemeanor arrests); 2 W. LaFave et al., *Criminal Procedure* § 3.5(a), at 202 (3d ed. 2007) ("It appears that the Fourth Amendment presents no barrier to abolition of the felony-misdemeanor distinction so as to permit warrantless arrests on probable cause in all cases."). Therefore, because Plaintiff's unlawful arrest claims against Defendants Epperly and Holcombe were brought pursuant to 28 U.S.C. § 1983, the Court will not consider the additional requirement that a warrantless misdemeanor arrest is unlawful unless the misdemeanor is committed in the presence of the arresting officer as required by Oklahoma law.[11]

Defendants Epperly and Holcombe argue that there was probable cause to arrest Plaintiff for two possible crimes. First, Defendants Epperly and Holcombe assert that they had probable cause to believe that Plaintiff violated Okla. Stat. tit. 21, § 1172, which provides the following:

A. It shall be unlawful for a person who, by means of a telecommunication or other electronic communication device, willfully either:

1. Makes any comment, request, suggestion, or proposal which is obscene, lewd, lascivious, filthy, or indecent;

2. Makes a telecommunication or other electronic communication with intent to terrify, intimidate or harass, or threaten to inflict injury or physical harm to any person or property of that person;
…
4. Makes a telecommunication or other electronic communication, whether or not conversation ensues, without disclosing the identity of the person making the call or communication and with intent to annoy, abuse, threaten, or harass any person at the called number;
…
D. Except as provided in subsection E of this section, any person who is convicted of the provisions of subsection A of this section, shall be guilty of a misdemeanor.

---

[11] The Court must, however, consider this additional requirement when evaluating Plaintiff's unlawful arrest claim, which was brought pursuant to Oklahoma law.

Second, Defendants Epperly and Holcombe assert that they had probable cause to believe Plaintiff violated Okla. Stat. tit. 63, § 2819, which provides, in relevant part, the following:

> No person shall call the number nine-one-one (911) for the purpose of making a knowingly false alarm or complaint or reporting knowingly false information which could result in the dispatch of emergency services from any public agency …. Nor shall any person call nine-one-one for nonemergency or personal use.

The Court finds that a genuine dispute of fact precludes summary adjudication as to whether Defendants Epperly and Holcombe were aware of facts sufficient to constitute probable cause for Plaintiff's arrest on the morning of March 5, 2008. Specifically, there is a genuine dispute of fact as to whether Defendants Epperly and Holcombe, after entering the McDonald's restaurant where Plaintiff was employed, placed a telephone call to the telephone number suspected of prank calling 911 and heard Plaintiff's cellular telephone ring in her pocket. If Defendants Epperly and Holcombe did not place a telephone call to the suspect number, then their probable cause determination was based primarily on the fact that Plaintiff had used a cellular telephone with this number to make a prank call more than three months prior to her arrest. In addition, the cellular telephone number was not even registered to Plaintiff. Under those circumstances, Defendants Epperly and Holcombe would have been required to make several speculative assumptions in order to develop probable cause. To be sure, absent some confirmation that Plaintiff was in possession of the cellular telephone linked to the suspect telephone number on the morning of March 5, 2008, Defendants Epperly and Holcombe's conclusion that Plaintiff used that cellular telephone to make the unlawful electronic communications was highly speculative. The Fourth Amendment does not allow police officers to speculate about probable cause; rather, probable cause must be based on the facts known to the police officers at the time of arrest. Accordingly, Defendants Epperly and Holcombe are not

entitled to summary adjudication on the issue of whether they had probable cause to arrest Plaintiff on the morning of March 5, 2008.

### b. Unlawful Seizure of Property

Plaintiff alleges that her Fourth Amendment right to be free from unreasonable seizure of her property was violated on three separate occasions: (1) the November 12, 2007 seizure of Plaintiff's cellular telephone by Defendant Epperly, (2) the November 27, 2007 seizure of Plaintiff's cellular telephone[12], and (3) the March 5, 2008 seizure of Plaintiff's cellular telephone by Defendants Holcombe and Epperly following Plaintiff's arrest.  It is undisputed that Defendants Epperly and Holcombe were not in possession of a warrant at the time of the seizures, and did not subsequently obtain a warrant.  "A warrantless seizure is *per se* unreasonable unless it falls within a few carefully delineated exceptions to the warrant requirement."  *DiCesare v. Stuart,* 12 F.3d 973, 977 (10th Cir. 1993).  Therefore, the Court must determine whether Defendants Epperly and Holcombe's warrantless seizures of Plaintiff's cellular telephone fit within an exception to the warrant requirement.  If these warrantless seizures do not fall within one of the exceptions to the warrant requirement, then the seizures constituted a violation of Plaintiff's Fourth Amendment rights.

### i. November 12, 2007 Seizure

With regard to the November 12, 2007 seizure of Plaintiff's cellular telephone, there is a factual dispute as to the circumstances leading up to the seizure. Plaintiff submits the following sequence of events:

> On November 27, 2007, Defendants Epperly and Holcombe came to my home. Upon arrival, they separated me from my Mother and then questioned me about [the] telephone.  Epperly told me to fill out a statement, then, after I signed it, he added things to it that I had not written.  Epperly and Holcombe told my Mother

---

[12] The Court does not address the legality of the November 27, 2007 seizure of Plaintiff's cellular telephone because the officer who executed the seizure is not a Defendant in this action.

that if I didn't give them the cellphone, that I would be arrested and put in the adult jail, because there were no juvenile beds available. My Mother and I[ ]were scared so we gave them the cellphone.

[Doc. No. 75, Ex. 26]. Defendant Epperly, however, submits the following:

In November of 2007 I was instructed to go to a minor's residence in Maud, OK because Katherine Burns, a minor at the time, was making prank phone calls to the Seminole County 911 dispatch center. When I arrived at the residence, I phoned the dispatch center and asked that they call the number making the 911 calls. Shortly thereafter, Katherine Burns' cell phone began to ring. I received a statement from Katherine Burns stating that she was making these calls and I took away her cell phone because her cell phone had been used to commit a crime.

…

After Katherine Burns wrote her statement, her mother, Judith Burns, wrote a few sentences at the bottom indicating that this was not the first time Katherine has been in trouble regarding making prank phone calls. I witnessed Ms. Judith Burns write that statement in her own handwriting, however, she did not sign it.

[Doc. No. 64, Ex. 24 at ¶ 3-4]. The voluntary statement from Plaintiff, contains an admission by Plaintiff to calling "different police stations" and "police officer[']s phone numbers."

Defendant Epperly argues that his actions in seizing Plaintiff's cellular telephone on November 12, 2007, are justified primarily by the plain view and the exigent circumstances exceptions. Essentially, Defendant Epperly's argument is that Plaintiff voluntarily proffered her cellular telephone and he was permitted to seize the cellular telephone because it was immediately apparent that the cellular telephone was incriminating. Further, Defendant Epperly argues that he could not wait to get a warrant before seizing Plaintiff's cellular telephone because he feared Plaintiff might seek to destroy the evidence before a warrant could be obtained and executed.

It is well established that evidence of a crime may be seized without a warrant under the plain view exception to the warrant requirement. Under the plain view exception, "[a] warrantless seizure of evidence is sustainable if (1) the police officer was lawfully located in a

place from which to plainly view the item; (2) the officer had a lawful right of access to the item; and (3) it was immediately apparent that the seized item was incriminating on its face." *United States v. Castorena-Jaime*, 285 F.3d 916, 924 (10th Cir. 2002) (citing *United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir.1996)). An item's incriminating nature is immediately apparent if "the officer had probable cause to believe the object was contraband or evidence of a crime." *Id.*

Turning to the first requirement of the plain view exception, the Court finds there is a disputed question of fact as to whether Defendant Epperly was lawfully located in a place from which Plaintiff's cellular telephone was within his plain view. *Id.* The parties do not point to any evidence in the record suggesting Plaintiff's cellular telephone was in the plain view of Defendant Epperly. At this stage in the litigation, the Court must view the evidence in a light most favorable to Plaintiff, and, therefore, assume the cellular telephone was not in Defendant Epperly's plain view. Thus, the plain view exception does not apply to the November 12, 2007 seizure of Plaintiff's cellular telephone.[13] Accordingly, the Court finds that Defendant Epperly is not entitled to summary judgment on this issue.[14]

---

[13] Even if Defendant Epperly was able to see Plaintiff's cellular telephone, there are genuine disputes of fact as to whether Defendant Epperly had probable cause to believe the subject cellular telephone was evidence of a crime. Specifically, Defendant Epperly claims that he was able to link the subject cellular telephone to the prank calls being investigated by calling Plaintiff's cellular telephone at the time he arrived. However, Plaintiff claims this telephone call did not take place. The Court finds simply seeing a cellular telephone associated with Plaintiff under the circumstances of this case is insufficient to give Defendant Epperly probable cause to believe the cellular telephone in question evidence of a crime—particularly because the cellular telephone in question was registered under Plaintiff's father's name.

[14] Defendant Epperly did not argue that Plaintiff gave consent by voluntarily proffering the subject cellular telephone for inspection. Nevertheless, the Court notes that disputed question of fact with regard to the circumstances surrounding the November 12 seizure of Plaintiff's cellular telephone prevent summary judgment on this issue. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *see also United States v. Sanchez,* 608 F.3d 685, 690 (10th Cir. 2010) (quoting *United States v. Taverna,* 348 F.3d 873, 878 (10th Cir. 2003) (explaining the Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government "(1) proffer clear and positive testimony that consent was unequivocal and specific and intelligently given, and (2) the officers must have used no implied or express duress or coercion.")).

### ii. March 5, 2008 Seizure

Defendants Epperly and Holcombe argue the warrantless seizure of Plaintiff's cellular telephone on March 5, 2008, was justified by the search incident to arrest and plain view exceptions to the warrant requirement. "Under the search incident to arrest exception [to the Fourth Amendment's warrant requirement], a police officer, incident to an arrest, may search a person." *Lavicky v. Burnett,* 758 F.2d 468, 474 (10th Cir.1985). This exception only applies to searches conducted after a lawful arrest. As discussed above, the Court finds the issue of whether Plaintiff arrest on March 5, 2008, was lawful is not appropriate for summary adjudication because of genuine disputes of material fact. These same unresolved factual questions also prevent the Court from determining whether the March 5, 2008 seizure of Plaintiff's cellular telephone following her arrest was a violation of Plaintiff's Fourth Amendment rights. Accordingly, this issue is not appropriate for summary adjudication.

### 2. Civil Conspiracy

To prevail on a § 1983 conspiracy claim, "'a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights.'" *Snell v. Tunnell,* 920 F.2d 673, 701 (10th Cir. 1990) (quoting *Dixon v. City of Lawton,* 898 F.2d 1443, 1449 (10th Cir. 1990)). Although "direct evidence of a conspiracy is rarely available and that the existence of a conspiracy must usually be inferred from the circumstances ..., [proof] of conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Crabtree ex rel. Crabtree v. Muchmore,* 904 F.2d 1475, 1481 (10th Cir. 1990); *see also Hunt v. Bennett,* 17 F.3d 1263, 1266 (10th Cir. 1994) (to plead a § 1983 conspiracy, a plaintiff must "allege specific facts showing agreement and concerted action among [alleged co-conspirators]"); *Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1230 (10th Cir. 1990) ("A civil

conspiracy requires the combination of two or more persons acting in concert.").  Plaintiff asserts a § 1983 conspiracy claim against Defendants Epperly, Holcombe, and Johnson, claiming these defendants conspired to prepare false reports and make false allegations against her.  The Court finds evidence in the record, even when viewed in a light most favorable to Plaintiff, insufficient to allow a jury to infer the existence of a conspiracy and concerted action.  Accordingly, Defendants Epperly, Holcombe, and Johnson are entitled to summary judgment on this claim.

### B.  Qualified Immunity

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  In the context of a § 1983 claim, a police officer is entitled to qualified immunity if "'a reasonable officer could have believed that probable cause existed to arrest' the plaintiff."  *Romero v. Fay,* 45 F.3d 1472, 1476 (10th Cir. 1995).  "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity."  *Hunter v. Bryant,* 502 U.S. 224, 227 (1991).

This Court's review of summary judgment motions in the qualified immunity context differs from that applicable to review of other summary judgment motions.  *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009).  "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established."  *Id.*  In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, the Court construes the facts in the light most favorable to the plaintiff as the

nonmoving party. *Scott v. Harris,* 550 U.S. 372, 378, 380 (2007); *see Riggins v. Goodman,* 572 F.3d 1101, 1107 (10th Cir. 2009) (noting that generally "we accept the facts as the plaintiff alleges them"). "[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record ..." *Thomson v. Salt Lake County,* 584 F.3d 1304, 1312 (10th Cir. 2009) (internal citations omitted); *see also Estate of Larsen ex rel. Sturdivan v. Murr,* 511 F.3d 1255, 1258 (10th Cir. 2008). Further, district courts are free to consider these factors in the order most appropriate for resolution of the specific case at issue. *Pearson,* 555 U.S. at 236 (overturning the mandate set forth in *Saucier v. Katz,* 533 U.S. 194 (2001)).

"In showing that the law was clearly established, the plaintiff does not have to show that the specific action at issue had been held unlawful, but the alleged unlawfulness of the defendant's conduct must be apparent in light of preexisting law." *Armijo By & Through Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1260 (10th Cir. 1998) (citations omitted). The plaintiff bears the burden of establishing that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* Normally, "[t]he plaintiff may satisfy his or her burden by showing that there is a Supreme Court or Tenth Circuit opinion on point, or that his or her proposition is supported by the weight of authority from other courts." *Id.* However, the plaintiff is not required "to produce a factually identical case, but allow some degree of generality in factual correspondence." *Id.* Instead, courts must take a more practical approach: "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).

If the Plaintiff is successful in demonstrating that a defendant violated a clearly established constitutional right, then the burden shifts back to the defendant, who must prove that "no genuine issues of material fact" exists and that the Defendant "[is] entitled to judgment as a matter of law." *Gross v. Pirtle,* 245 F.3d 1151, 1156 (10th Cir. 2001). Therefore, the Defendants still bear the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense. *See Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1312 (10th Cir. 2002) (citing *Farmer v. Perrill,* 288 F.3d 1254, 1259 (10th Cir. 2002)). "When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be 'properly denied.'" *Olsen,* 312 F.3d at 1312 (citing *Salmon v. Schwarz,* 948 F.2d 1131, 1136 (10th Cir. 1991)).

In accordance with the aforementioned principles, the Court analyzes Plaintiff's remaining claims to determine whether Plaintiff has met her burden to demonstrate that Defendants Epperly and Holcombe's actions violated a clearly established constitutional right. Because the Court concluded above that genuine disputes of material facts existed with regard to the remaining claims, Defendants Epperly and Holcombe are not entitled to qualified immunity if Plaintiff has met her burden.

**1. Unlawful Arrest Claim**

The law with regard to the unlawful arrest is clear. "Generally, a warrantless arrest is constitutionally valid when an officer has probable cause to believe that the arrestee committed a crime." *Stearns*, 615 F.3d at 1282-83 (citing *Oliver,* 209 F.3d at 1186). "When a warrantless arrest is the subject of a § 1983 action, the defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the

plaintiff." *York v. City of Las Cruces,* 523 F.3d 1205, 1210 (10th Cir. 2008). Thus, "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (quotations omitted). The Court finds that, even viewing the evidence in a light favorable to Plaintiff, a reasonable officer could have mistakenly believed that probable cause existed to arrest Plaintiff on the morning of March 5, 2012. Therefore, Defendants Epperly and Holcombe are entitled to qualified immunity for Plaintiff's claim that Defendant violated the Fourth Amendment by making an unlawful arrest. Accordingly, Defendants Epperly and Holcombe are entitled to summary judgment on Plaintiff's § 1983 claims for unlawful arrest.

### 2. November 12, 2007 and March 5, 2008 Seizures

The law with regard to the illegal seizure of property is clear. As discussed above, "[a] warrantless seizure is *per se* unreasonable unless it falls within a few carefully delineated exceptions to the warrant requirement." *DiCesare*, 12 F.3d at 977 (10th Cir. 1993). The law with regard to the plain view exception, upon which Defendant Epperly's November 12, 2007 seizure of Plaintiff's cellular telephone is based, is also clear. "A warrantless seizure of evidence is sustainable if (1) the police officer was lawfully located in a place from which to plainly view the item; (2) the officer had a lawful right of access to the item; and (3) it was immediately apparent that the seized item was incriminating on its face." *Castorena-Jaime*, 285 F.3d at 924 (citing *Sanchez,* 89 F.3d at 719). Accordingly, Defendant Epperly is not entitled to qualified immunity on Plaintiff's claim that the November 12, 2007 seizure of Plaintiff's cellular telephone violated Plaintiff's Fourth Amendment right.

Defendants Epperly and Holcombe are, however, entitled to qualified immunity on the March 5, 2008 seizure of Plaintiff's cellular telephone because, as discussed above, the Court

finds that Defendants Epperly and Holcombe could have reasonably believed that probable cause existed to arrest Plaintiff on the morning of March 5, 2008. As such, the search incident to arrest and plain view exceptions justify the March 5, 2008 seizure of Plaintiff's cellular telephone. Therefore, Defendants Epperly and Holcombe are entitled to qualified immunity on Plaintiff's claim that the March 5, 2008 seizure of Plaintiff's cellular telephone violated the Fourth Amendment. Accordingly, Defendants Epperly and Holcombe are entitled to summary judgment on Plaintiff's § 1983 claims for unlawful seizure of her cellular telephone on March 5, 2008.

### B. State Law Malicious Prosecution Claim

Plaintiff also asserts a state law malicious prosecution claim against Defendants Epperly, Holcombe, and Johnson. "Under Oklahoma law, a plaintiff bears the burden of affirmatively showing the following elements to establish a claim of malicious prosecution: (1) the bringing of the action, (2) its successful termination in favor of the plaintiffs, (3) want of probable cause, (4) malice, and (5) damages." *Meyers v. Ideal Basic Indus., Inc.*, 940 F.2d 1379, 1383 (10th Cir. 1991) (citing *Young v. First State Bank,* 628 P.2d 707, 709 (Okla. 1981); *Tulsa Radiology Assocs., Inc. v. Hickman,* 683 P.2d 537, 539 (Okla. Ct. App. 1984)). Defendants Epperly, Holcombe, and Johnson focus on the third element—want of probable cause. As discussed above, the Court finds there are disputed questions of fact precluding summary adjudication on the issue of whether Defendants Epperly and Holcombe had probable cause to arrest Plaintiff on March 5, 2008. Further, there is evidence in the record, when viewed in a light most favorable to Plaintiff, sufficient to support the other elements of a malicious prosecution claim. Accordingly, Defendants Epperly, Holcombe, and Johnson are not entitled to summary judgment on this claim.

## II.     CLAIMS AS TO DEFENDANT SEMINOLE BOARD OF COUNTY COMMISSIONERS

Plaintiff asserts the following state law tort claims against the Board: (1) false arrest, (2) assault, (3) battery, (4) malicious prosecution, and (5) abuse of process.[15]  [Doc. No. 36].

### A.  False Arrest

The tort of false arrest "is the unlawful restraint of an individual against his will." *Delong v. State ex rel. Okla. Dep't of Pub. Safety,* 1998 OK CIV APP 32, ¶ 5, 956 P.2d 937, 938 (internal citations omitted).  "When the unlawful detention is caused by an individual acting under authority of law, it gives rise to a claim for false arrest rather than false imprisonment." *Craig v. City of Hobart*, CIV-09-0053-C, 2010 WL 680857, *3 (W.D. Okla. Feb. 24, 2010). Generally, under Oklahoma law, "the only element required to maintain a false arrest claim is that the arrest was made without probable cause." *Id.* (citing *Gouskos,* 122 F.App'x at 970). However, with regard to arrests for misdemeanor violations of the law, the violation must have been committed in the presence of the arresting officer in order to be a lawful arrest.  Thus, "absent a lawful warrant an officer may not arrest for a misdemeanor committed outside the officer's presence, and that such an arrest is illegal." *Bynum v. State*, 490 P.2d 531, 533 (Okla. Crim. App. 1971); *see also Gaines v. State*, 230 P. 946 (Okla. Crim. App. 1924); *Yates v. State*, 117 P.2d 811 (Okla. Crim. App. 1941); *Kinkade v. City of Tulsa*, 310 P.2d 615 (Okla. Crim. App. 1957).  Plaintiff was arrested for alleged misdemeanor violations of Oklahoma law; accordingly, Plaintiff's arrest was lawful only if the misdemeanor violations were witnessed by the arresting officer.

---

[15] The Board argues that Plaintiff's claims of malicious prosecution and abuse of process were not properly plead in Plaintiff's Complaint.  [Doc. No. 57, 7].  However, because the Court finds that the Board is entitled to summary judgment on Plaintiff's abuse of process and malicious prosecution claims, the Court declines to address this argument.

As discussed above, there are genuine disputes of material facts precluding summary judgment on the issue of whether Defendants Epperly and Holcombe had probable cause to arrest Plaintiff on March 5, 2008. Further, the Court also finds that there is a genuine dispute as to whether Defendant Holcombe witnessed a prank 911 telephone call to the Seminole County Dispatch Center on March 5, 2008. Accordingly, summary judgment is denied as to Plaintiff's false arrest claim against the Board.

### B. Remaining State Law Tort Claims

The Board contends that it is entitled to summary judgment on the remaining state law tort claims asserted by Plaintiff. Pursuant to the Oklahoma Governmental Tort Claims Act (the GTCA), Okla. Stat. tit. 51, §§ 151 *et seq.*, the state and its political subdivisions are not liable for the actions of employees acting outside the scope of their employment. *Id.* at § 153(A). The Act defines "scope of employment" to mean "performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority ... ." *Id.* at § 152(11).

The Board argues that, because all of the remaining tort claims asserted by Plaintiff against it are intentional torts, the Officers could not have been acting in good faith when they were allegedly committed. Under Oklahoma law, municipalities may be liable for certain intentional torts committed by employees acting within the scope of their employment. *See Nail v. City of Henryetta,* 911 P.2d 914, 917 n. 8 (Okla. 1996). However, a government entity is immune from intentional tort claims committed by employees acting in bad faith. *Id.* The Court evaluates each of the remaining state law tort claims to determine if the Board is immune from liability.

### 1. Assault

Oklahoma follows the definition of assault as set forth in the Restatement (Second) of Torts. *See Brown v. Ford*, 905 P.2d 223, 229 n. 34 *(overruled on other grounds).*

(1) An actor is subject to liability to another for assault if

(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

(b) the other is thereby put in such imminent apprehension.

Restatement (Second) of Torts § 21 (1965). "Because this tort requires that the Officers intend to cause a harmful or offensive contact, it is clear that it cannot be committed in good faith." *Craig*, 2010 WL 680857, *4. Accordingly, the Board is entitled to summary judgment on Plaintiff's assault claim.

### 2. Battery

Oklahoma also follows the definition of battery as set forth in the Restatement (Second) of Torts. *See Brown*, 905 P.2d at 229 n. 34.

(1) An actor is subject to liability to another for battery if

(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contact, and

(b) a harmful contact with the person of the other directly or indirectly results.

For the same reason that assault cannot be committed in good faith, battery may not be committed in good faith. Accordingly, the Board is entitled to summary judgment on Plaintiff's battery claim.

### 3. Malicious Prosecution

Under Oklahoma law, malicious prosecution requires "the plaintiff to prove 1) that the defendant maliciously instituted the action; 2) without probable cause; 3) which the plaintiff

successfully defended; and 4) with resulting damage to the plaintiff." *Callaway v. Parkwood Village, L.L.C.*, 1 P.3d 1003, 1005, n. 1 (Okla. 2000). The Court finds that it is not possible to *maliciously* institute an action against another in good faith. Accordingly, the Board is entitled to summary judgment on Plaintiff's malicious prosecution claim.

**4. Abuse of Process**

Under Oklahoma law, "the elements of an abuse of process claim are 1) the improper use of the court's process; 2) primarily for an ulterior or improper motive; 3) with resulting damage to the plaintiff." *Roberts v. Goodner's Wholesale Foods, Inc.*, 50 P.3d 1149, 1152 (Okla. Civ. App. 2002). The Court finds that one cannot use court process with an ulterior or improper motive while acting in good faith. Accordingly, the Board is entitled to summary judgment on Plaintiff's abuse of process claims.

<u>**CONCLUSION**</u>

For the reasons cited above, the Board's Motion for Summary Judgment is **GRANTED in part and DENIED in part;** Plaintiff's Motion for Summary Judgment is **DENIED;** and Defendants Epperly, Holcombe, and Johnson's Motion for Summary Judgment is **GRANTED in part and DENIED in part.**

**DATED this 21st day of June, 2013.**

James H. Payne
United States District Judge
Eastern District of Oklahoma